IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 22-cv-003151-LTB

V.B, on behalf of J.B,

        Plaintiff,

v.

MARTIN O'MALLEY[1], Commissioner of the Social Security Administration,

        Defendant.

## ORDER

Plaintiff, V.B., appeals from the final decision of the Commissioner of the Social Security Administration ("SSA") denying her deceased husband's application for disability insurance benefits filed pursuant to Title II of the Social Security Act 42 U.S.C. §401, *et. seq.* Jurisdiction is proper under 42 U.S.C. §405(g). Oral argument would not materially assist me in the determination of this appeal. After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the SSA Commissioner's decision as follows.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying the application for disability insurance benefits filed by her husband J.B. (the "Claimant") on July 20, 2020, before he passed away on December 4, 2020.

---

[1] Effective December 20, 2023, pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley, Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. §405(g).

[Administrative Record at Doc #8 "AR" 198-206] After Claimant's application was initially denied on December 23, 2020 [AR 69-84], and again denied upon reconsideration on August 10, 2021 [AR 85-101], an Administrative Law Judge ("ALJ") held a telephonic evidentiary hearing on April 7, 2022 [AR 40-68], and thereafter issued a written ruling on April 20, 2022. [AR 14-35] The ALJ found that Claimant was disabled as of November 7, 2020, but denied his application for prior to that date on that basis that Claimant could perform his past relevant work as an Administrative Clerk and, thus, was not disabled (Step Four). [AR 14-35] Thus, the relevant period of time at issue here is March 30, 2018 (Claimant's alleged onset date) through November 6, 2020 (the date before the ALJ found Claimant to be disabled). [AR 19]

The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination making the Commissioner's decision final on October 6, 2022. [AR 1-7] Plaintiff timely filed her complaint with this court seeking review of the Commissioner's final decision on December 6, 2022. [Doc #1]

## II. FACTS

Claimant's date of birth was January 12, 1962, and he was fifty-six years old on March 30, 2018, his alleged onset date. [AR 42, 44, 198] The ALJ found that Claimant had at least a high school education. [AR 27] Claimant worked as a clerk for the Denver Elections Division from January of 1992 to March of 2018. [AR 222]

The medical records reveal that prior to his onset date, Claimant was diagnosed with diabetes, hypertension, and ischemic heart disease. [AR 295, 403,

2

1804, 2293-2307, 3481] In addition, in September of 2014 Claimant was admitted to the hospital for chest pain and hemolytic anemia. [AR 293-96, 314, 403] At that time he was diagnosed with Chronic Lymphocytic Leukemia ("CLL") [AR 74, 312, 1297, 2514], and subsequently underwent treatment. [AR 913-1243, 1888, 2513] Also at that time Plaintiff had a myocardial infarction and underwent surgery in October 2014 for coronary artery stent placement [AR 314, 403-04], and another stent was placed in April 2016. [AR 1426-27] Claimant had another episode of hemolytic anemia in June 2016 [AR 741], and thereafter started on Ibrutinib. [AR 2000] In 2016 and 2017, Claimant sought regular treatment and testing related to his heart disease. [AR 1318-22, 1426-1524, 1554-64, 1577-88, 1823, 2294-99, 3436-51, 3474-79] In the Fall of 2017, Claimant experienced lower back pain, and an x-ray showed degenerative changes of the lumbar spine [AR 894-96], and an MRI revealed minimal degenerative disc disease at the L3-4 and L4-5 regions. [AR 885-93, 2276-81] Claimant attended three physical therapy sessions in December of 2017 for his chronic bilateral lower back pain. [AR 857-85]

Claimant alleged a disability onset date of March 30, 2018, due to the limiting effects of his: heart condition, diabetes, and leukemia (CLL). [AR 200] The medical records at that time reveal that Claimant was being followed by an internist for his continued uncontrolled diabetes, essential hypertension, and his asymptomatic heart disease. [AR 791-94, 786-803, 3470-72] On April 10, 2018, Claimant saw his internist complaining of fatigue and headache, and indicated that he thought he might be getting a cold. [AR 791] As to his CLL, the records indicate

3

Claimant saw his oncologist on May 24, 2018, who noted that Claimant had stable blood counts with no evidence of hemolytic anemia, and that he was tolerating the Ibrutinib well aside from cramps. [AR 764-68] During a visit on August 23, 2018, Claimant's oncologist assessed him an Eastern Cooperative Oncology Group (ECOG) performance status score of 1, which indicates that he was "restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light housework, office work." [AR 741]

At a visit with his treating internist on August 30, 2018, Claimant's uric acid serum was tested to assess his chronic gout at multiple sites. [AR 714-36] A visit with a podiatrist on September 25, 2018, revealed absent reflexes in the patella and Achilles in both legs, adequate strength in his legs and feet, normal sensation, and no lesions, ulcerations, or skin involvement in both legs and feet [AR 668-76], but he had acquired equinus deformity of both feet. [AR 668] Also at this time, Claimant was evaluated for left knee pain (rated at a 7/10 in severity which was worse with walking) that had been ongoing for the past month. [AR 751-57] After a rehab therapy evaluation of his left knee on October 8, 2018, Claimant participated in three therapy sessions in the Fall of 2018, and was discharged with reports of improved symptoms. [AR 632-43, 656-68, 698-712, 1907, 1933-34, 1937-39] During those visits Claimant reported that he had competed in a few bowling tournaments without any issues [AR 660, 1917], and he went to a Denver Broncos game without any concerns. [AR 636, 586]

On November 28, 2018, Claimant's chief complaint during an exam with his

4

oncologist was fatigue, but the examination notes do not indicate any further discussion or follow-up of this symptom. [AR 621-31] The next day, on November 29, 2018, Plaintiff saw his internist who adjusted his blood pressure medication, due to the need for slightly better control, but indicated Claimant's cardiovascular examination was otherwise normal [AR 602-19, 606], and his diabetes was controlled. [AR 605] Claimant reported that he was taking some time off from bowling because of right hand numbness and weakness [AR 606], but examination notes revealed normal range of motion, normal strength, and intact sensation in both arms. [AR 608]

Claimant began physical therapy for his neck pain/lower cervical radiculopathy starting on December 21, 2018. [AR 1923-26] At his initial appointment Claimant reported that he had to reduce the weight of his bowling ball due to some pain in his neck and right arm, and he indicated that he continued to walk daily around City Park. [AR 1924] Claimant attended three more physical therapy appointments for his neck pain [AR 1917-23] and, at his last appointment on January 25, 2019, he reported being able to bowl without difficulty or pain. [AR 1917-19]

A kidney ultrasound in December of 2018 revealed a rental cystic lesion. [AR 2196] A subsequent MRI confirmed a multi-ocular cyst arising from the superior pole of the left kidney, but a follow up assessment of Claimant's kidney disease and elevated serum creatinine determined there were no indications for dialysis. [AR 1909, 2192]

5

On February 1, 2019, Claimant called into his oncologist's office and reported flu-like symptoms, in that he felt tired and weak with chills, a rash, and a fever earlier in the week, and that he was spitting up little clots of blood. [AR 1916] Claimant subsequently went to urgent care for evaluation of his hemoptysis (coughing up of blood from the respiratory tract) [AR 1911-12], which had resolved by the next day. [AR 1912] At Claimant's visits with his oncologist on February 14, and March 28, 2019, he reported no further episodes of hemoptysis. [AR 1903-07, 1908-9] At that time his oncologist allowed Claimant to stop Ibrutinib, with close monitoring, and assessed him as well-appearing with an ECOG performance status of 1. [AR 1908] Claimant saw his oncologist regularly thereafter, through October of 2019, during which his CLL was assessed as stable and his ECOG performance status continued to be at level 1. [AR 1892-93, 1899-1900, 1903-08]

On April 22, 2019, Claimant saw his cardiologist and reported very mild shortness of breath when he exerted himself more than usual but indicated that he felt good. [AR 3464-66] His cardiologist determined that Claimant was doing well with respect to his ischemic heart disease; he noted that his blood pressure was "okay," and made no changes to his medication regimen. [AR 3466] During his May 29, 2019 visit with his oncologist, he was well appearing [AR 1899-1900], and at his December 18, 2019 and March 5, 2020 visits, Claimant reported that he felt well, and a full review of systems was negative; he was again assessed an ECOG performance status of 1, and there was no concern about progression of his CLL. [AR 1881-82, 1888]

On March 9, 2020, Claimant saw his internist for his elevated glucose; his medications were adjusted, and he was advised to alter his diet and alcohol intake. [AR 1878-80] Claimant was also evaluated, on March 12, 2020, for chronic kidney disease when a kidney ultrasound revealed significant asymmetry and numerous cysts thought to be associated with increased serum glucose, but there was no indication for dialysis, and his number subsequently normalized. [AR 1875, 1896] Claimant's medications were again adjusted on April 13, 2020, due to complaints of headaches that started after his recent dosage increase. [AR 1872-73]

At a visit with his cardiologist on May 11, 2020, Claimant reported he was feeling good and although he could not bowl or do other activities due to the COVID shutdown, he walked his dog (an Akita) twice daily and he was assessed as doing well with respect to his ischemic heart disease. [AR 3457-59] On June 18, 2020, during a visit with his oncologist, Claimant reported that he felt well, and he was again assessed an ECOG performance status of 1 with relatively stable bloodwork, but with a minor drop in hemoglobin. [AR 1867-68]

Claimant began receiving health care from Kaiser Permanente in the Fall of 2020, and he attended initial appointments with an internist on September 22, 2020, and with an oncologist for his CLL on October 2, 2020. [AR 2514, 2511-19, 2535-89] At these visits, Claimant complained of occasional cramps in his legs, chest pain and nose bleeds (epistaxis). [AR 2513, 2515, 2535, 2538] The Kaiser Permanente oncologist also assessed an ECOG performance status of 1. [AR 2513]

The following month, on November 7, 2020, Claimant was admitted to St.

Joseph's Hospital due to shortness of breath, fever, anemia, and lymphocytosis in the setting of exertional chest pain for the last two weeks. [AR 2990-94] On December 4, 2020, Claimant died at the hospital due to COVID pneumonia resulting in multi-organ failure, CLL, Acute Immune Anemia, and Adult Respiratory Distress Syndrome. [AR 2294, 3427]

Plaintiff, Claimant's widow, testified at the evidentiary hearing on April 7, 2022, that Claimant passed away on December 4, 2020, due to complications from his CLL and COVID. [AR 46] She testified that Claimant stopped working in 2018 due to fatigue caused by his leukemia medication and chemotherapy. [AR 46, 51, 53] She stated that after Claimant retired, he slept six hours during the day and was unable to help with the cooking, cleaning, or shopping due to his fatigue. [AR 47-48] Plaintiff indicated that she tried to get him to go outside and walk, but he did not want to walk because his knees hurt. [AR 52] She testified that he also had diabetes, hypertension, depression, hemolytic anemia, gout in his knee, and a heart condition that caused a racing heart and shortness of breath, which prevented him from bowling. [AR 47-48, 53-55] She indicated that he suffered fatigue from his medications [AR 50-51], and that he lost about 50 pounds in a six-month period in 2019. [AR 57]

### III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically

8

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The sequential evaluation process used to determine whether a claimant is disabled in the relevant time period starts with Step One, which is a determination of whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §404.1520(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §404.1520(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §404.1520 (e)&(f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA

9

Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education, and work experience. *See* 20 C.F.R. §404.1520(g)).

## IV. ALJ's RULING

The ALJ here found that Claimant had not engaged in substantial gainful activity after his alleged onset date of March 30, 2018. [AR 20] The ALJ found that Claimant had the severe impairments of: Chronic Lymphocytic Leukemia ("CLL"), ischemic heart disease, essential hypertension, diabetes mellitus, and obesity, as well as the severe impairment of a COVID infection as of November 7, 2020, resulting in respiratory failure and multi-organ failure (Step Two). [AR 20] The ALJ further found that Claimant had the non-severe physical impairments of: gout; left knee pain; and neck/cervical spine pain (Step Two). [AR 20-21] The ALJ determined, however, that Claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment prior to November 7, 2020 (Step Three). [AR 21-22]

The ALJ then determined that, prior to November 7, 2020, Claimant retained the residual functional capacity (RFC) to perform light work, in that he could stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday, but he was limited to only: frequent balancing, stooping, kneeling, crouching or crawling; frequent climbing ramps or stairs; and occasional climbing ladders, ropes, or scaffolds. [AR 22] The ALJ found no non-exertional limitations on

Claimant's ability to work. [AR 22] Based on this assessed RFC, the ALJ found that, prior to November 7, 2020, Claimant was capable of performing his past relevant work as an Administrative Clerk, as this work did not require the performance of work-related activities precluded by his RFC. [AR 26] As a result, the ALJ concluded that Claimant was not disabled at Step Four of the sequential evaluation process from March 18, 2018, the alleged onset date, through November 6, 2020. [AR 28] This is the ruling at issue here.

The ALJ further determined that upon his hospitalization for COVID-19 on November 7, 2020, Claimant was unable to perform work at a simple and routine level for up to one-third of the workday. [AR 28] Based on this assessed RFC, the ALJ found that Claimant was prevented from performing his past work (Step Four), and there were no jobs in significant numbers in the national economy that Claimant could have performed (Step Five) and, thus, he was disabled as of November 7, 2020. [AR 28-29]

## V. STANDARD OF REVIEW

In Social Security appeals, this Court reviews the ALJ's decision to determine whether the factual findings were supported by substantial evidence in the record as a whole, and whether the correct legal standards were applied. *Levan v. Berryhill*, No. 18-CV-02340-NRN, 2019 WL 2336852 (D. Colo. 2019)(unpublished) (citing *Pisciotta v. Astrue*, 500 F.3d 1074, 1075 (10th Cir. 2007)); *see also Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003).

"Substantial evidence is such relevant evidence as a reasonable mind might

11

accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Kidd v. Comm'r, SSA*, No. 21-1363, 2022 WL 3041097 (10th Cir. Aug. 2, 2022)(unpublished)(quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). In addition, "the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. ___, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue, supra*, 489 F.3d at 1084 (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

Then, "[t]he failure to apply proper legal standards may, under the appropriate circumstances, be sufficient grounds for reversal independent of the substantial evidence analysis." *Kidd v. Comm'r, supra* (quoting *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014)); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). For example, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

Therefore, reviewing courts "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Lax v. Astrue, supra,* 489 F.3d at 1084; *see also Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).

## VI. ANALYSIS

On appeal, Plaintiff asserts that the ALJ erred in failing to include Claimant's fatigue when assessing his RFC prior to his hospitalization on November 7, 2020. An RFC is defined as the most a claimant can do notwithstanding any impairment related functional limitation. 20 C.F.R. §404.1545(a)(1); *see also* Social Security Ruling 83-10, 1983 WL 31251 (1983)(indicating that an RFC determination is the most work the claimant can perform, not the least). The RFC assessment considers the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §404.1545(a)(4). The RFC must include a function-by-function assessment of all exertional and non-exertional impairments. Social Security Ruling 96-8p, 1996 WL 374184 (1996). The SSA Commissioner is to "consider all of [the claimant's] medically determinable impairments of which [the SSA is] aware, including [the claimant's] medically determinable impairments that are not 'severe.' " 20 C.F.R. §404.1545(a)(2).

Here, Plaintiff argues that the ALJ's failure to include Claimant's non-exertional limitations – specifically, his fatigue from his CLL and his CLL medication – constitutes reversable error because the Social Security Regulations mandate that the ALJ must include all of the limiting effects of a claimant's impairments, even those impairments that are non-severe, when assessing their RFC. *See* 20 C.F.R. §404.1545(a) & (e). The Commissioner responds that the ALJ here reasonably assessed Claimant's functional workplace limitations prior to November 7, 2020, in that the order reveals that when assessing Claimant's

13

limitations, the ALJ reviewed the entirety of the record, addressed both positive and negative findings therein, and explained the reasoning behind his finding that Claimant remained capable of performing a reduced range of light work.

The ALJ first found that the medical evidence failed to corroborate the allegation that Claimant became disabled from working on March 30, 2018 (his alleged onset date) because he was diagnosed with CLL in September of 2014, but he continued to work until March of 2018 "which suggests that his impairments were not disabling." [AR 23] Additionally, the ALJ noted that Claimant told medical providers that he retired from work in March of 2018 and that he planned to travel [AR 792], "which suggests that he did not stop working due to his medical conditions." [AR 23] Furthermore, the ALJ noted that the "treatment records do not document any change or deterioration in [his] medical conditions on or before the date that he stopped working" and instead revealed that "his medical conditions were stable, well-controlled, and asymptomatic around the date he stopped working." [AR 23]

The ALJ further found that Claimant's CLL was well controlled after July of 2016, as he stopped Ibrutinib in January of 2016, and thereafter his cell counts remained normal and there was no progression of disease, until he was hospitalized with COVID-19 in November of 2020. The ALJ further indicated that after the onset date, an October 2017 echocardiogram was normal (other than mild left ventricular hypertrophy) and clinical record showed that Claimant did well from a cardiovascular standpoint. Likewise, the ALJ found that Claimant's essential

14

hypertension was fairly well controlled, and his type II diabetes was well controlled on medication. And although Claimant had stage 1 or 2 chronic kidney disease, he had no other diabetic or hypertensive complication. As such, the ALJ concluded that, during the relevant period, Claimant was limited to light exertional work, with other physical limitations (such as climbing ladders, etc.) as "the medical evidence as a whole shows that [Claimant's] impairments were asymptomatic and well controlled and did not otherwise affect his ability to work." [AR 24]

As to Plaintiff's testimony that her husband stopped working due to fatigue cause by his CLL and the related treatment, the ALJ concluded that:

> the statements of the claimant's widow were inconsistent with the information contained in the medical records. For example, the claimant's widow testified that he first had leukemia in 2018. However, the medical evidence shows that the claimant was diagnosed with leukemia in October 2014. The claimant's widow testified that he stopped working due to fatigue related to leukemia and his medications, but medical records show that he did not complain of fatigue to his medical providers. On the contrary, the claimant typically reported feeling well and he consistently denied symptoms related to CLL or his other medical conditions, which is contrary to the hearing testimony.
>
> The claimant's widow testified that he had gout flare-up every other week that lasted about three days, during which his knee swelled, and he had to have his knee drained. However, medical records do not show any evidence of gout flare-ups during the relevant period. The claimant did not complain of gout symptoms to his medical providers, his physical examinations were consistently unremarkable with no clinical evidence of gout, laboratory tests showed normal uric acid levels, and there is no evidence that he required drainage of fluid from his knees. The claimant's widow also testified that his blood pressure was consistently high, he would get dizzy, and he complained of headaches a lot. Medical records show that the claimant's blood pressure was typically in the goal range or only slightly elevated. However, the claimant did not complain to his physicians of dizziness, headaches, or other possible symptoms of high blood pressure. The record documents one

15

> complaint of headaches in April 2020 possibly related to an increase in diabetes medication. However, other than this isolated occurrence the claimant typically did not complain of headaches. The claimant's widow testified that he was anemic quite a bit. However, medical records show that he was not anemic and his laboratory tests were within normal limits and stable over time. The claimant's widow testified that he felt his heart was always racing, he had shortness of breath, and he had to stop bowling due to these symptoms. However, medical records show that the claimant typically reported that he felt well from a cardiovascular standpoint, and he consistently denied significant cardiac symptoms. The claimant's widow testified that he had depression and problems with memory. However, the claimant did not complain of depression or cognitive problems to his physicians, and during clinic visits he showed normal mental findings with normal attention, mood, affect, speech, behavior, thought content, cognition, memory, and judgment.
>
> The claimant's widow testified that he lost a significant amount of weight, from 240 pounds to about 190 pounds. She stated that this occurred over a six-month period in 2019, and that he did not gain the weight back before he got Covid. However, the medical evidence is not consistent with her testimony. Progress notes show that the claimant's weight fluctuated somewhat over time but not to the extent described at the hearing. For example, in 2019 his weight ranged from 218 to 227 pounds, and in 2020 his weight increased from 209 pounds in March 2020, to 219 pounds in September 2020. The claimant did report some weight loss just before he was hospitalized with Covid in early November 2020. However, from the alleged onset date through the time he became ill with Covid, the claimant's body-mass index remained in the range of 31 to 33, consistent with mild obesity. The claimant did not experience problematic weight loss related to his medical conditions, and his medical providers did not express any concern about weight loss. [AR 24-25]

Finally, as to the limitations set out in the Function Report submitted by

Claimant, the ALJ noted that he:

> described difficulty functioning due to weakness and lack of energy. He stated that he needed assistance to perform personal care activities such as bathing and dressing, he needed reminders to shower and take medication, and he did not prepare meals. However, he stated that he was able to travel by walking and driving, he was able to go out alone, he was able to shop in stores, and his leisure activities included watching sports and television shows, which he did daily. The undersigned notes that this document was

16

> completed on November 25, 2020, while he was hospitalized in the intensive care unit and acutely ill with Covid. The limitations described on the Function Report do not clearly relate to the period prior to his acute illness, and therefore may not be an accurate reflection of his functioning during most of the relevant period. Elsewhere in the record the claimant reported daily activities which are not consistent with a finding of disability. For example, in October 2018 he reported that he had been able to bowl in a few tournaments without any issues. He reported feeling comfortable with bowling and he went to a Broncos game. In December 2018 he reported bowling and walking daily around City Park. In January 2019 he reported bowling, and in October 2019 he reported that he was going out of town for three weeks. In May 2020 he reported walking the dog twice a day. The activities that the claimant reported to his medical providers are not consistent with his allegations of disability or with the limitations that his widow described at the hearing. [AR 25-26]

Thus, the ALJ relied on the following evidence when discounting the assertion that Claimant was limited in his ability to work due to fatigue: his reported activities to his health care providers regarding his plans on retirement, as well as his ability to bowl, walk his dog, and attend a Broncos games, and that the majority of his reports to his providers were that he felt well (and he often denied fatigue), which was supported by his physical examination findings, lab work, and his ECOG performance status scores. To the extent that Plaintiff takes issue with the ALJ's specific ruling that the "medical records show that he did not complain of fatigue to his medical providers" during the relevant period [AR 24], I agree with the Commissioner that the records indicate that Claimant complained of fatigue only once (except in three other instances of acute illness such as cold and flu-like symptoms or bronchitis) during a visit with his oncologist on November 28, 2018. [AR 621-31] Such minimal evidence does not allow me to reweigh the ALJ's determination given that the ALJ's ruling relying on substantial conflicting

17

evidence in the record. In so ruling, I reject Plaintiff's assertion that the ALJ's ruling was a "total mischaracterization" of the record [Doc #20 pg. 1], and that a reconsideration of Claimant's RFC in light of this error is required to assess whether substantial evidence supports the ALJ's determination. [Doc #20 pp. 2-3]

The evidence to support the ALJ's findings and determination that Claimant was capable of light work during the relevant period is "more than a scintilla, but less than a preponderance," and thus constitutes substantial evidence. *Lax v. Astrue, supra,* 489 F.3d at 1084; *see also Biestek v. Berryhill, supra,* 139 S. Ct. at 1150 (noting that substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

ACCORDINGLY, for the foregoing reasons, I AFFIRM the final order of the SSA Commissioner denying Claimant's application for disability insurance benefits.

Dated: March 22, 2024 in Denver, Colorado.

                                          BY THE COURT:

                                           s/Lewis T. Babcock_____
                                          LEWIS T. BABCOCK, JUDGE